DOCUMENT ELECTRONICALLY FILED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
BODO PARADY, as Special Administrator of
the Estate of SABINA PARADI and BODO
PARADY and MARY MOORE, individually,

07 CIV 3640 (JCF)
ECF CASE

Magistrate Judge Francis-all purposes

Plaintiffs,

**NOTICE OF MOTION IN LIMINE**
**TO BAR TESTIMONY OF STEVEN**
**FLANAGAN, M.D. AND ANGELO**
**CANEDO, Ph.D., PLAINTIFFS'**
**MEDICAL EXPERTS, ON ISSUE**
**OF PAIN AND SUFFERING AND**
**LEVEL OF AWARENESS**

-against-

MICHAEL R. PHILLIPS,

Defendants,

------------------------------------------------------------ x

   **PURSUANT** to Fed. R. Evid. 702 and 703, defendant moves to bar the medical

reports and trial testimony of Steven Flanagan, M.D. and Angelo Canedo, Ph.D., plaintiffs'

medical experts.

   Dr. Flanagan opined (**Exhibit "A"**) that "Sabina Paradi was minimally conscious,

had the capacity to feel pain and had some level of awareness of her environment", because

Dr. Flanagan's opinion is based on hearsay from non-professional witnesses.  Plaintiffs'

expert, Dr. Canedo, Ph.D., opined in his June 21, 2007 report (**Exhibit "B"**), "She is

demonstrating signs of being in a vegetative state and might be able to progress to a

minimum responsive state over a graduated period of recovery with a consistent program of

stimulation and close response monitoring."

Defendant's expert, John Caronna, M.D., Vice Chairman Neurology Department Cornell University, reviewed medical records, including decedent's Autopsy Report, and the "Supplemental Case Information" appended to the Autopsy Report performed by the Chief Medical Examiner of the City of New York on July 10, 2007. The "Supplemental Case Information" appended to the Autopsy Report was written by a member of the Resident Staff of the CCU at New York-Presbyterian Hospital Columbia Medical Center, Dr. E. Gilmore. Dr. Caronna, defendant's expert, on page 4 of his report (**Exhibit "C"**), quotes Dr. E. Gilmore as follows:

> "Despite efforts and being transferred from hospital to rehab and back, she remained in a vegetative state throughout her hospital course. She was given a 1% chance of recovering. Her family decided on extubating her, and she was given comfort care."

Dr. Caronna also reviewed records of decedent's CT Scans of the head which showed evidence of multiple skull fractures, as written on page 4 of his report, where he said, "CT Scans of the brain taken immediately after the head trauma and subsequently while the patient was at St. Vincent's Catholic Medical Center in Manhattan, document the severity of the head trauma and the diffuse brain injury. The electroencephalogram performed on April 3, 2007, prior to transfer to New York Presbyterian Hospital, confirms the diffuse nature of the injury and is not compatible with a conscious state".

Dr. Caronna continues in his report, reviewing records from Helen Hayes Hospital, where decedent was admitted May 1, 2007, after transfer from New York Presbyterian Hospital, where Dr. Caronna wrote:

2

> "On neurological examination, the admitting physician, Dr. Glenn Seliger, noted on mental status, 'she does not alert to voice or follow commands. She may show some non-specific arousal to voice. She does not track or clearly blink to threat.' On motor exam, he found 'little or no significant movement even to pain. The hands tend to be kept in more of an extensor posture. Legs are currently braced and more difficult to assess but only trace movement in the toes is noted.' ".

Dr. Caronna also wrote that: "These records indicate that as of May 1, 2007, Ms. Paradi had not recovered consciousness and remained in a vegetative state."

Dr. Caronna's report, on page 5, quotes from records of New York Presbyterian Hospital Columbia Medical Center, April 18, 2007 to May 1, 2007, and from May 7, 2007 to June 30, 2007. In summary, he says:

> "The MRI Scans confirm the presence of diffuse brain injury involving both the cortex and the brain stem. The EEG showed slowing and low voltage nature of the electrical output of the brain confirmed the absence of consciousness."

Dr. Caronna wrote further:

> "Multiple notes from the Neuro ICU Attendings and Residents confirm that the patient had no evidence of consciousness. On April 21, 2007, the Neuro ICU Attending wrote that, 'The patient breathes spontaneously, that her pupils were reactive and that her eyes were open, but that she had no response to command. She may have blinked to threat on the right but not on the left. She had opistotonic posturing (opistotonic posturing is extensor or decerebrate posturing again is not compatible with conscious state).' ".

Dr. Caronna comments on Dr. Flanagan's report that states, "On several occasions, she was noted to be agitated.", citing an Occupational Therapist's note and a nurse's note. Dr. Caronna writes, "These episodes were 'autonomic storms', that were the seizure-like discharges of a damaged brain, not related to any conscious agitation or upset."

3

He also mentions that "There were neurology and neurosurgical notes that noted that the patient intermittently followed simple commands and was noted to move her left upper arm purposefully. I have quoted notes immediately after these from the Neuro ICU Attendings, which indicate that the patient had only decerebrate, reflex posturing, and that she was rigid and spastic with contractures of all limbs and therefore could not have moved purposefully as described."

Dr. Flanagan, plaintiffs' expert, also concluded that decedent was "in a minimally conscious state". Dr. Caronna states that, "He infers this from the presence of agitation which is a misinterpretation of her disautonomia and movements of her left upper arm which were interpreted as purposeful on three occasions and following simple commands on two occasions. These observations were not confirmed by the patient's ICU Attendings, and it was the opinion of the doctors taking care of her that she never manifested any evidence of consciousness."

Angelo Canedo, Ph.D., a licensed Psychologist retained by plaintiffs, visited the patient on June 19, 2007, screened her for potential consideration for Coma Stim/Coma Recovery Program, did not review her chart, did not discuss her medical condition with any of the doctors, and obtained information from the decedent's parents. He spent fifteen minutes in the ICU and stated he could not comprehensively evaluate the patient. His impression was that the patient was in a "vegetative state" and might be able to progress to the minimally responsive state over a period of time (**Exhibit "B"**).

4

Dr. Caronna wrote on page 7 of his report:

> "My medical impression upon review of these records is that Sabina Paradi suffered a severe and diffuse traumatic brain injury on February 25, 2007 that rendered her unconscious from the moment of impact until her death on June 30, 2007. At some point subsequent to the head injury, she evolved from coma (a sleep-like state from which the patient cannot be awakened) to the vegetative state (a state of wakefulness without consciousness). Imaging studies performed periodically during her course showed evidence of severe structural damage to the brain; EEG's both at St. Vincent's and at New York-Presbyterian Hospital showed low voltage and diffuse slowing indicative of severe brain damage without consciousness."

> "Her autopsy performed at the Medical Examiners Office on July 10, 2007 confirmed the presence of 'chronic, diffuse, anoxic ischemic encephalopathy with neuronal loss and gliosis as well as focal cortical neucrosis of the left frontal lobe with cortial and white matter contusions of both frontal and temporal lobes as well as a neucrosis and scarring of the basalgangilia (right phalamus) and the brain stem."

Dr. Caronna then said:

> "I, therefore, must conclude that the allegations that the patient on some days in April followed commands or moved her left side purposefully or was agitated, represent misinterpretations of reflex postures. It is not possible for a patient who suffered the injuries that Ms. Paradi suffered, to have any conscious experience. It was in recognition of this fact that her physicians at New York-Presbyterian Hospital recommended that she be made DNR and be withdrawn from aggressive care. I find that with a reasonable degree of medical certainly, that Sabina Paradi suffered no conscious pain and suffering from the time of the trauma on February 25, 2007 until her death on June 30, 2007."

5

# MEMORANDUM OF LAW

## POINT I

### FED. R. EVID. 702 FOCUSES ON PRINCIPLES AND *METHODOLOGY* USED BY THE EXPERT NOT ON HIS CONCLUSIONS

Daubert v. Merrill Dow Pharmaceutical, Inc., 1993, 509 U.S. 579, 594-595, and 113 S.Ct. 2786 at 2797, the Court said:

> "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity - and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."

Dr. Flanagan, plaintiffs' Medical Expert on conscious pain and suffering, has elected a methodology to formulate his opinion that decedent "felt pain and responded favorably to treatment" by relying on nurses' notes and not on the Neuro ICU Attendings' and Residents' notes that the decedent had no evidence of consciousness. On April 21, 2007, the Neuro ICU Attending wrote that the patient breathes spontaneously, that her pupils were reactive and that her eyes were open but that she had no response to command. She may have blinked to threat on the right but not on the left. She had opistotonic posturing (opistotonic posturing is an extensor or decerebrate posturing again is not compatible with conscious state).

6

Dr. Flanagan also ignored the Autopsy Report and the Supplemental Case Information to the Autopsy Report prepared by Dr. E. Gilmore at NYU Presbyterian Hospital Columbia Medical Center that stated, "Despite efforts and being transferred from hospital to rehab and back, she remained in a vegetative state throughout her hospital course. She was given a 1% chance of recovering. Her family decided on extubating her and she was given comfort care."

In addition, Dr. Flanagan ignored the CT Scans of the brain and the electroencephalogram performed April 3, 2007 prior to transfer to New York Presbyterian Hospital confirming the diffuse nature of the injury that was not compatible with a conscious state.

A Discharge Summary from May 7, 2007 from Helen Hayes Hospital indicated that decedent had not recovered consciousness and remained in a vegetative state.

Dr. Flanagan wrote, "On several occasions she was noted to be agitated", citing an Occupational Therapist's note and a nurse's note. Dr. Caronna wrote, "These episodes were autonomic storms that were the seizure-like discharges of a damaged brain, not related to any conscious agitation or upset."

Dr. Flanagan also mentions that there were neurology and neurosurgical notes that noted that the patient intermittently followed simple commands and was noted to move her left upper limbs purposefully. Dr. Caronna quoted immediately after these notes from the Neuro ICU Attending Physicians, which indicated that the patient had only decerebrate, reflect posturing and that she was rigid and spastic with contractures of all limbs and, therefore, could not have moved purposefully as described.

7

Dr. Flanagan's opinion that decedent was in a "minimally conscious state" because of the misinterpretation of her disautonomia and movements of her left upper limb which were interpreted as purposeful on three occasions and following simple commands on two occasions, were not confirmed by the patients ICU Attending Physicians and it was the opinion of the doctors taking care of her that she never manifested any evidence of consciousness.

The report of Angelo Canedo, a licensed Psychologist, was that the patient was in a vegetative state and might be able to progress to the minimally responsive state over a period of time, but that he could not comprehensively evaluate the patient in the 15 minutes he spent in the ICU. His Supplemental Report indicates decedent was in a vegetative state but there was potential to progress to a minimum responsive state.

Dr. Caronna wrote on page 7 of his report (**Exhibit "C"**), "Imaging studies performed periodically during her course showed evidence of severe structural damage to the brain; EEG's both at St. Vincent's and at New York-Presbyterian Hospital showed low voltage and diffuse slowing indicative of severe brain damage without consciousness." On page 8, he said, "It is not possible for a patient who suffered the injuries that Ms. Paradi suffered to have any conscious experience. It was in recognition of this fact that her physicians at New York-Presbyterian Hospital recommended that she be made DNR and be withdrawn from aggressive care."

8

Plaintiffs' attorney has indicated that he will call at trial several of decedent's close friends to testify regarding "decedent's responses to stimuli", thereby telling the jury decedent "had a level of awareness" not seen by her Neurologists and CT Scan Technicians. Such testimony of a medical condition is likewise barred as unreliable.

## POINT II

### NEW YORK PATTERN JURY INSTRUCTIONS 2:280 DEFINE CONSCIOUS PAIN AND SUFFERING AS PAIN AND SUFFERING OF WHICH THERE WAS SOME LEVEL OF AWARENESS BY PLAINTIFF (DECEDENT)

The Pattern Jury Instructions indicate that if there is an issue relative to the level of plaintiff's awareness, the following should be charged:

> "Conscious pain and suffering means pain and suffering of which there was some level of awareness of plaintiff (decedent)."

This is based on McDougald v. Garber, 73 N.Y.2d. 246, 538 N.Y.S.2d. 937, 536 N.E.2d. 372; Ramos v. Saah, 293 A.D.2d. 459, 740 N.Y.S.2d. 376; and NYCLS EPTL § 5-4.4.

Based on the medical records and CT Scan results reviewed by Dr. Caronna and largely ignored by plaintiffs' experts, Dr. Flanagan and Dr. Canedo, decedent, Sabina Paradi, was at no time capable of experiencing pain, having no evidence of consciousness. She was in a vegetative state, a state of wakefulness without consciousness, according to Dr. Caronna (**Exhibit "C", page 7**).

The movement of decedent noted by various witnesses was explained by Dr. Caronna with the aid of multiple notes from the Neuro ICU Attendings and Residents that the patient had no evidence of consciousness and that the movement was called "opistotonic posturing", not compatible with conscious state.

10

Dr. Caronna also indicated that the movements were "autonomic storms", that were the seizure-like discharges of a damaged brain, not related to any conscious agitation or upset. Dr. Caronna mentions that there were neurology and neurosurgical notes that stated that the patient intermittently followed simple commands and was noted to move her left upper arm purposefully. I have quoted notes immediately after these from the Neuro ICU Attendings, which indicate that the patient had only "decerebrate, reflex posturing", and that she was rigid and spastic with contractures of all limbs and, therefore, could not have moved purposefully as described.

With regard to Dr. Flanagan's minimally conscious state opinion, Dr. Caronna writes: "The observations noted by Dr. Flanagan were not confirmed by the patient's ICU Attendings and it was the opinion of the doctors taking care of her that she never manifested any evidence of consciousness."

11

## CONCLUSION

For the foregoing reasons, it is respectfully urged that the reports and testimony of Steven Flanagan, M.D. and Angelo Canedo, Ph.D. be barred at trial.

DATED: July 18, 2008

          Respectfully submitted,

          JAMES D. BUTLER, P.A.
          591 Summit Avenue
          Jersey City, New Jersey 07306
          (201) 653-1676
          Attorneys for Defendant, Michael R. Phillips

BY:   s/ Paul A. Liggio
       PAUL A. LIGGIO (PAL/8122)
       JAMES D. BUTLER (JDB/9427)

12

# EXHIBIT

# "A"

STEVEN R. FLANAGAN, M.D.
1 GUSTAVE L. LEVY PLACE
BOX 1240
NEW YORK, NY 10029

November 26, 2007

Michael Kaplen
427 Bedford Road
Suite 260
Pleasantville, New York 10570

RE:    SABINA PARADI

Dear Mr. Kaplen,

     The following is a narrative report regarding Sabina Paradi.  The following is
based on my review of medical records from St. Vincent's Medical Center, Columbia
Presbyterian Hospital, Helen Hayes Hospital and a brief report from Angelo Canedo,
Ph.D.

     Sabina Paradi was a 23 year old woman who was a pedestrian struck by a motor
vehicle on February 25, 2007.  Emergency medical personnel reportedly found her
unconscious at the scene of the collision, with her pupils dilated and in a decorticate-
decerebrate posture.  She was brought to St. Vincent's Medical Center where her
Glasgow Coma Score was reported as four and was intubated.  A head CT scan revealed
an extensive subarachnoid hemorrhage, right subdural hemorrhage with mass-effect and
subfalcine herniation to the left, left mastoid air cell opacification suggesting an
underlying left temporal bone fracture, fractures involving the occipital bones bilaterally,
sphenoid bone, and clivus, and pronounced mass-effect with obliteration of the basal and
perimesencephalic cisterns.  A hemicraniectomy was performed on February 26, 2007.
Her cerebral perfusion pressure was maintained between 60-90.  Her course was
complicated by pancreatitis and pneumonia.  She required placement of a tracheotomy
and gastrostomy.  Repeat head CT scanning on February 28, 2007 revealed evidence of
the right frontoparietal craniectomy, extension of the brain through the craniectomy
defect, left to right midline shift, bifrontal hemorrhagic contusions, and blood along the
right tentorium and the posterior aspect of the right interhemispheric fissure.  A follow up
scan revealed the presence of hydrocephalus, requiring placement of a V-P shunt.
Additional scanning performed on March 14 revealed infarcts within the right posterior
temporal and bilateral occipital lobes.  MR imaging of her brain obtained on April 14
revealed multiple parenchymal contusion as well as small areas of focal hemorrhagic
axonal injury, extra-axial hemorrhagic collection consistent with the known history of
subarachnoid and subdural hemorrhages, and bilateral mastoid disease.  On several
occasions, she was noted to be agitated (OT note March 27, RN note April 6) and was at
times medicated with analgesics resulting in decreased agitation (RN note March 23-24,
RN note April 7).  She intermittently followed simple commands (Neurosurgery note

March 31, Neurology notes April 9 and 12) and was noted to move her left upper limb purposefully (Neurosurgery notes April 9, April 12 and April 17).

She was transferred to New York-Presbyterian Hospital Columbia Presbyterian Center on April 18, 2007. The admission note indicated that physicians at St. Vincent's felt that she had inconsistently followed commands. Her course was notable for autonomic storming, treated with multiple medications. She received intramuscular botulinum toxin for abnormally increase muscle tone. She was transferred to Helen Hayes Hospital for rehabilitation on May 1, 2007. She was transferred back to Columbia Presbyterian on May 7 because of swelling around the hemicraniectomy site in addition to continued storming. While at Columbia, her parents agreed to have medical staff provide only comfort care given her poor prognosis for recovery. She was pronounced dead on June 30, 2007.

In summary, Sabina Paradi sustained a severe traumatic brain injury on February 25, 2007. Her course at St. Vincent's Medical Center indicated she intermittently moved her left arm purposefully and occasionally followed simple commands. Her level of consciousness, based on these entries, indicates that she was in a Minimally Conscious State. The Minimally Conscious State is differentiated from the Vegetative State by evidence that an individual maintains at least an intermittent ability to demonstrate purposeful activity in response to either internal or external environmental stimulation. One hallmark of the Minimally Conscious State is that evidence of purposeful behavior is typically intermittent, which is well characterized by her course at St. Vincent's Medical Center. She was also noted to be agitated at times, which was at least partially managed successfully with analgesics, providing evidence that she felt pain and responded favorably to treatment. Given the above, it is my opinion that Sabina Paradi was minimally conscious, had the capacity to feel pain and had some level of awareness of her environment.

In my opinion to a reasonable degree of certainty, her injuries, hospital course, the complications that developed and her death were caused by the injuries she sustained on February 25, 2007.

The foregoing is true to the best of my knowledge. I am a physician licensed to practice in the State of New York.

Sincerely,

Steven R. Flanagan, M.D.

# EXHIBIT

# "B"

Brief screening of Ms. Sabitha Parady on 6/19/07

**REFERRAL INFORMATION**
Patient seen at bedside at around noon. Both parents were present at her bedside in the Neuro ICU and awaiting my visit. Patient seen as a courtesy to Michael Kaplan to screen for potential consideration for Coma Stim/Coma Recovery Program after discharge from Columbia Presbyterian.

Patient remains in critical care environment and this curtailed my evaluation. Chart was not seen and no discussions were held with medical staff as to current/past status or impressions. Parents provided very brief info during 2 – 3 minute phone conversation with her father last Thursday (6/14/07). Had spoken with Michael Kaplan that morning and he asked if I would screen/consult on patient. However, at time of this brief (approximately 15 minutes) contact in ICU a comprehensive evaluation could not be completed. Without medical record review and an understanding of patient's current condition I would not risk making clinical interventions/assessments that might cause distress or discomfort and jeopardize the patient.

**CLINICAL SCREEN**
Ms. Parady is a 24 year old female, status post motor vehicle accident approximately 3 months ago with loss of consciousness and coma. She is now status post a flap as per family report and has a VP shunt upon review. After the surgical procedure she began to have some "storming" which is now intermittent but still occurring daily as per their report. She is monitored and managed in the Neuro ICU. During this brief screen she initially presented as unresponsive and subaroused. She demonstrated decorticate posturing upon contact. She had spontaneous eye opening and widening when tactile contact and mild extension of her fingers was performed. She demonstrated increased tone in all 4 extremities (L > U). She demonstrated foot drop bilaterally with fairly rigid extension. She had a notable wrist drop on the left and had mild edema of the right hand. Despite overriding paretic involvement of all 4 limbs she seemed to demonstrate slightly more hemiparetic signs on the right side. She demonstrated no voluntary movements during this observation. When she was touched on her hands she showed mild head rotation to the left (possible orienting) and eye opening/widening. Mild auricular touch caused generalized visceral contractions/withdrawal. She intermittently demonstrated notable random fluctuations in blood pressure, at one point reaching as high as 178/110 and then dropping back to the normal range. Facial features were notable for slightly more facial droop on the right and mild ptosis on the left. She demonstrated predominantly reflexive responding on brief screening along with startle responses to gentle tactile contact.

**SUMMARY**
A more comprehensive evaluation was not performed at this time for the reasons previously noted. At this point with only cursory and preliminary information available, Ms. Parady does appear to be a potential, albeit marginal candidate for a Coma Stimulation Program once she is deemed medically stable to transfer from an acute care setting. She is demonstrating signs of being in a vegetative state and might be able to progress to a minimum responsive state over a graduated period of recovery with a consistent program of stimulation and close response monitoring. The family members were given information about the Brady Institute Coma Stimulation Program. Will reevaluate at the point she is deemed medically stable and potentially ready for step-down to a Coma Stimulation Program as was the case when she had gone to Helen Hayes prior to the return to Columbia for her most recent surgical procedure.

_____          6/21/07
Angelo R. Canedo Ph.D.                    Date
NYS Licensed Psychologist

## ANGELO R. CANEDO, Ph.D., M.S., L.N.H.A.

**N.Y.S. LICENSED NURSING HOME ADMINISTRATOR**
**N.Y.S. LICENSED PSYCHOLOGIST**

38-11 Corporal Stone Street
Bayside, New York  11361
(718) 428-1742

February 1, 2008

De Caro & Kaplen, LLP
Counselors at Law
Attention: Mr. Michael Kaplen
427 Bedford Road, Suite 260
Pleasantville, New York 10570

Dear Mr. Kaplen,

I am writing at your request to provide further clarity on the statements I made during my brief clinical examination of Ms. Sabina Paradi. As noted in my clinical summary, Ms. Paradi was seen bedside in the ICU. Details of the exam appear in my clinical summary dated 6/21/07 and the examination occurred on 6/19/07. My report was dictated the evening of my examination and transcribed/edited on the 21st.

At the time of the examination the patient was demonstrating signs of being in a vegetative state but I felt there was the potential to progress to a minimum responsive state as noted in my clinical summary.

She demonstrated reflexive and spontaneous responses. However, there were times when she seemed to orient to voice and was more consistent when it was her father's voice. There were affective changes noted when responding to family as opposed to calls by this clinician. She also intermittently demonstrated sustained visual pursuit when it did not require notable head movements and she was able to track across midline. She responded to comforting and to changes in vocal inflection/intonation with facially demonstrative changes coupled with decreased facial tension/tone. Unfortunately, careful and prolonged observation was not afforded because of her being in an ICU setting.

My visit was to discern her potential to participate in a Coma Stimulation Program. My report notes that I thought she demonstrated some potential albeit marginal at the time because of her more acute clinical status.

While unable to follow instructions reliably nor able to communicate her needs verbally, she did demonstrate repeatedly the ability to localize to face and sound and to demonstrate, albeit minimally, some repeated awareness of stimuli that were both soothing and threatening. Through reproducible visual fixation and some facial affective responses to specific eliciting stimuli such as a familiar soothing voice she did show

## ANGELO R. CANEDO, Ph.D., M.S., L.N.H.A.

**N.Y.S. LICENSED NURSING HOME ADMINISTRATOR**
**N.Y.S. LICENSED PSYCHOLOGIST**

38-11 Corporal Stone Street
Bayside, New York  11361
(718) 428-1742

preliminary evidence that she was entering a minimally conscious state. As consciousness seems to present on a continuum these early signs were potentially indicative of the ability to show some further gains in a structured sensory stimulation program.

In summary, it is my opinion that Sabina Paradi had the ability to feel pain and demonstrated same during the evaluation. Sabina also demonstrated evidence of being aware of particular stimuli in her environment. These indicators support my opinion that Sabina was minimally conscious.

Respectfully submitted,

Angelo R. Canedo, Ph.D., M.S., L.N.H.A., F.A.C.H.E.
NYS Licensed Psychologist

# EXHIBIT

# "C"



**CORNELL**
U N I V E R S I T Y

**NEW YORK PRESBYTERIAN**
H O S P I T A L

John J. Caronna, M.D.
*Louis and Gertrude Feil Professor of Neurology*
*Vice Chairman, Department of Neurology and Neurosciences*

520 East 70th Street
New York, NY 10021
Telephone: 212 746-2304
Fax: 212 746-8742

January 28, 2008

Mr. James Butler
591 Summit Avenue
Jersey City, New Jersey  07306

Re:  Sabina Paradi

Dear Mr. Butler:

Briefly, the history of the present illness is that Ms. Paradi was a 23-year-old woman who was struck by a pickup truck on 2/25/07. She was treated initially at Saint Vincent's Medical Center. Her initial Glasgow Coma Score was 4, that is, no speech, no eye opening, and reflex (decorticate posturing) movements only. The pupils were unreactive to light. CT scan showed extensive subarachnoid hemorrhage and a right hemisphere subdural hematoma with an 8 mm. right-to-left shift. There were bilateral occipital bone fractures. She had an emergency hemicraniectomy performed on 2/26/07 but postop remained unresponsive with pinpoint pupils that were sluggishly reactive.

The course at Saint Vincent's Medical Center was complicated by pancreatitis thought to be due to Propofol and pneumonia. Her pancreatitis resolved spontaneously. She had a percutaneous enterogastrostomy performed on 3/2/07 and a tracheostomy on 3/7/07. She was transferred to New York-Presbyterian Hospital Columbia Medical Center for continuing care and notes there indicate that she remained unresponsive but with eye opening to stimulation without tracking or response to voice or commands. There was withdrawal to painful stimuli with the limbs bilaterally but no pain localization. During her hospitalization she had many episodes of dysautonomia that were ascribed to her traumatic brain injury and the presence of diffuse axonal injury and preadmission hypoxia. The episodes consisted of increased temperature, heart rate, and blood pressure in the setting of increased tone and posturing of her limbs. She remained at New York-Presbyterian Hospital Columbia Medical Center from 4/18/07 until 5/1/07 when she was transferred to Helen Hayes Hospital for rehabilitation.

Mr. James Butler                    -2-                    January 28, 2008
Re:  Sabina Paradi

She had to be transferred back to New York-Presbyterian Hospital on 5/7/07 because of swelling around her hemicraniectomy in addition to recurrent episodes of dysautonomia.  While she was at New York-Presbyterian Hospital, her parents agreed to have her made comfort care only because of her poor prognosis for recovery of consciousness and she died on 6/30/07.

The following records were reviewed:

1.  Autopsy Report.  An autopsy was performed at The Office of the Chief Medical Examiner of The City of New York on 7/10/07.  On general examination it was noted that she had a palpable subcutaneous ventriculoperitoneal shunt inserted into the left frontal parietal scalp region that was also visible over the left side of the neck, the left side of the chest, and the upper right side of the abdomen.  There was a circular skull defect (1.4") over the left frontal parietal skull and the VP shunt entered the brain through the dura.  There was a 7" C-shaped surgical scar over the right parietal region with an underlying prosthetic cranioplasty.  Cranioplasty had clips in place in the native skull without tissue overgrowth.  There was an irregular pink scar (1/4") over the occipital region just to the right of the midline.  There were healing nondisplaced hairline fractures across the left posterior fossa and the right posterior fossa.  A tracheostomy tube was placed and there was a percutaneous endoscopic gastrostomy tube over the left side of the abdomen that was in place in the stomach.

The brain weighed 1450 grams, showed no evidence of epidural or recent subdural hemorrhage.  There was no evidence of a cervical spine fracture.  The heart was normal but the lungs, in their posterior aspect, were dark purple, firm, and edematous.

On microscopic examination the following findings were notable:  In the heart there was focal contraction band necrosis, fatty infiltration of the right ventricle.  In the lungs was evidence of pneumonia with focal intraalveolar macrophages, slight focal intraalveolar inflammatory cells.  They were mainly mononuclear and there were focal peribronchial and interstitial inflammatory cells, also mainly mononuclear cells.

Mr. James Butler                -3-                January 28, 2008
Re: Sabina Paradi

Cerebrospinal fluid was cultured and was positive for staphylococcus that was coagulace negative. Blood and cerebrospinal fluid grown in a blood culture bottle were negative for any organisms.

Toxicology performed on the vitreous humor of the eye was positive for Fentanyl and morphine which had been given therapeutically antemortem.

Neuropathological examination of the brain revealed golden yellow discoloration of the orbital surface of the left frontal lobe with softening of various gyri, namely the gyri recti and the medial orbital gyri. The right occipito-temporal and right temporal pole gyri were also softened. There was disruption and nonhemorrhagic necrosis (death of tissue) in the gyri mentioned above. There were no focal lesions of the nuclear structures of the brain nor was there any shift of the midline structures.

The spinal cord dura showed evidence of a subdural hemorrhage in the thoracic region measuring 7x1.2 cm. Transverse sections showed nonhemorrhagic softening of the midthoracic spinal cord measuring 5 cm. in length. (**Comment:** These findings indicate that there was a spinal cord injury that would have led to paraplegia had the patient survived.)

Microscopic sections showed necrosis, gliosis (that is, scarring), and macrophages (infiltration of inflammatory cells) of the right thalamus and the periventricular gray matter nuclei in the medulla. The hippocampus showed neuronal loss and gliosis. Microscopic sections through the gyri previously mentioned showed necrosis with many microphages, vascular proliferation, gliosis and foci of hemosiderin pigment (remnant of the breakdown of red cells).

The diagnosis was traumatic brain injury, remote; status post craniectomy with skull prosthesis and ventriculostomy; subdural hemorrhage organized over the cerebral convexities and spinal cord; subarachnoid hemorrhage organized over the left frontal lobe; cortical and white matter contusions, frontal and temporal lobes; chronic diffuse anoxic-ischemic encephalopathy with neuronal loss and gliosis; organizing microinfarcts and focal cortical necrosis of the left frontal lobe.

There is "supplemental case information" appended to this report. The source of the information was a member of the resident staff of the CCU at New York-

Mr. James Butler                          -4-                          January 28, 2008
Re: Sabina Paradi

Presbyterian Hospital Columbia Medical Center, a doctor E. Gilmore. The report summarizes her stay and her course and is remarkable for the following: "Despite efforts and being transferred from hospital to rehab and back, she remained in a vegetative state throughout her hospital course. She was given a 1% chance of recovering. Her family decided on extubating her and she was given comfort care."

    2.    Records of Saint Vincent's Catholic Medical Centers of New York – Manhattan. Of note, these records are the results of a CT scan of the head performed without contrast on 2/25/07 and following craniectomy on 3/14/07. There 3/14/07 CT scan documents infarcts within the right posterior temporal lobe and bilateral occipital lobes, larger on the left. There was prolapse of the brain through the right fronto-parietal craniotomy. There was persistence but decrease in density of the hemorrhage involving both frontal lobes and there was a decrease in the previously-noted left-to-right shift of the brain under the falx. Previous CT scans had been performed on 2/25, 2/26 immediately following the right fronto-parietal craniectomy and evacuation of the right convexity subdural hemorrhage, and also on 2/28/07. Of note is the fact that these CT scans also showed evidence of multiple skull fractures including a left temporal bone fracture, bilateral occipital bone fractures, bilateral sphenoid bone clivus, and left petrous portion of the temporal bone fractures. The report of the 2/26 CT scan raises the possibility that the petrous bone fractures may impinge on the internal carotid arteries bilaterally.

    A CT scan of the cervical spine without contrast performed 2/25/07 showed no evidence of cervical spine fracture of subluxation. CT scan with contrast performed on 3/2/07 did not show any evidence of vascular abnormalities. CT scan on 3/6/07 showed placement of VP shunt for hydrocephalus following subarachnoid hemorrhage. Twenty-one channel EEG performed 4/3/07 showed low amplitude and diffusely-slow polymorphic delta activity. (Comment: CT scans of the brain taken immediately after the head trauma and subsequently while the patient was at Saint Vincent's Catholic Medical Center in Manhattan document the severity of the head trauma and the diffuse brain injury. The electroencephalogram performed on 4/3/07 prior to transfer to New York-Presbyterian Hospital confirms the diffuse nature of the injury and is not compatible with a conscious state.

    3. Admission, history and physical from Helen Hayes Hospital. Admission date was 5/1/07. The admission history reviews the present illness and lists the

Mr. James Butler                    -5-                    January 28, 2008
Re: Sabina Paradi

medications the patient was on at the time of transfer from New York-Presbyterian Hospital Columbia Medical Center. On neurological examination, the admitting physician, Dr. Glenn Seliger, noted on mental status "she does not alert to voice or follow commands. She may show some nonspecific arousal to voice. She does not track or clearly blink to threat." On motor exam he found "little or no significant movement even to pain. The hands tend to be kept in more of an extensor posture. Legs are currently braced and more difficult to assess but only trace movement in the toes is noted."

A discharge summary dated 5/7/07 indicates that while at Helen Hayes Hospital the patient's PEG became clogged and was discontinued. Her Depakote, an antiseizure drug, had to be discontinued because of abnormal liver function tests. Swelling around the right side of the head necessitated transfer back to New York-Presbyterian Hospital. (Comment: These records indicate that as of 5/1/07 Ms. Paradi had not recovered consciousness and remained in a vegetative state.)

Records from New York-Presbyterian Hospital Columbia Medical Center from 4/18-07 – 5/1/07 and from 5/7/07 – 6/30/07. Following transfer to Columbia Presbyterian, she had repeated CT scans of her head and an MRI of the brain that showed the presence of extensive injury. On an MRI on 4/18/07, there was bulging of the right frontal and parietal lobes through the boney defect of the previous hemicraniectomy. There were bilateral frontal lobe parenchymal hematomas still evident. There was also parenchymal bleeding still present in the left posterior lateral frontal lobe, the posterior lateral right temporal lobe, and the anterior right temporal lobe. There was a subdural collection along the right side of the tentorium and a small rightsided extra-axial collection. There was "extensive FLAIR hyperintensity involving the frontal regions bilaterally...adjacent to the posterior left frontal hematoma likely related to a combination of encephalomalacia (brain softening), edema (brain swelling), and/or gliosis (scarring of the brain tissue)....Gradient echo images revealed small petechial hemorrhages involving the subcortical white matter primarily in the temporal lobes bilaterally as well as the posterior midbrain and the pons and the splenium of the left corpus collosum suggestive of diffuse axonal injury.... In addition, there was evidence of hydrocephalus, intraventricular hemorrhage in the right occipital horn and enlargement of the left lateral ventricle related to exvacuo dilation caused by loss of left frontal lobe brain tissue. A repeat EEG on 4/22/07 showed "severe, diffuse, background slowing and attenuation more prominent on the right indicative of

Mr. James Butler                        -6-                    January 28, 2008
Re: Sabina Paradi

diffuse cerebral dysfunction worse on the right...." Continuous monitoring on over several days, 4/18-22/07 showed similar findings. (Comment: The MRI scans confirm the presence of diffuse brain injury involving both the cortex and the brainstem. The EEG showed slowing and low voltage nature of the electrical output of the brain confirming the absence of consciousness.).

4. Multiple notes from the Neuro ICU attendings and residents confirm that the patient had no evidence of consciousness. On 4/21/07 the Neuro ICU attending wrote that the patient breathed spontaneously, that her pupils were reactive, and that her eyes were open but that she had no response to command. She may have blinked to threat on the right but not on the left. She had opistotonic posturing. (Opistotonic posturing is extensor or decerebrate posturing again is not compatible with conscious state.)

On 4/23 it was noted that she had spontaneous, saccadic EOMs but was rigid and spastic in all four extremities. On 4/24/07 a note states that the patient is vegetative with eyes open. On 4/29/07 spontaneous eye opening was noted but not to stimulation.

Subsequently, at the end of June, 2007, because of the patient's failure to regain consciousness and her poor prognosis, the family allowed her to be comfort care only and she was allowed to die without intervention.

5. A report by Steven R. Flannigan, a physiatrist at Mount Sinai Hospital in New York dated November 26, 2007 and addressed to Michael Kaplen. Dr. Flannigan reviewed medical records of Saint Vincent's, New York-Presbyterian Hospital, Helen Hayes Hospital, as well as a brief report from Angelo R. Canado, Ph.D. Dr. Flannigan noted that "on several occasions she was noted to be agitated...." He cites an occupational therapist note of 3/27, a nurse's note of April 6. (Comment: These episodes were autonomic "storms" that were the seizure-like discharges of a damaged brain, not related to any conscious agitation or upset. He also mentions that there were Neurology and Neurosurgical notes that noted that the patient intermittently followed simple commands and was noted to move her left upper limb purposefully. I have quoted notes immediately after these from the Neuro ICU attendings which indicate that the patient had only decerebrate, reflex posturing and that she was rigid

Mr. James Butler                -7-                January 28, 2008
Re: Sabina Paradi

and spastic with contractures of all limbs and, therefore, could not have moved purposefully as described.

On the basis of these findings, Dr. Flannigan concludes that the patient was in a minimally conscious state. The minimally conscious state he correctly differentiates from the vegetative state by stating such a patient has an intermittent ability to demonstrate purposeful activity in response to internal or external stimulation. He bases this on her intermittent agitation which has been explained, he infers the presence of the minimally conscious state from the presence of agitation which is a misinterpretation of her disautonomia and movements of her left upper limb which were interpreted as purposeful on three occasions and following simple commands on two occasions. These observations were not confirmed by the patient's ICU attendings and it was the opinion of the doctors taking care of her that she never manifested any evidence of consciousness.

6. A report of Angnelo R. Canado, a licensed psychologist, who visited the patient on 6/19/07. He saw the patient to screen her for potential consideration for coma stim/coma recovery program following discharge. He did not review the chart. He did not discuss her medical condition with any of the doctors caring for the patient. He obtained information from the patient's parents. He spent fifteen minutes in the ICU and said that he could not comprehensively evaluate the patient. He reviewed the history and he mentioned she presented as unresponsive and demonstrated decorticate posturing upon contact. It was his impression that the patient was a potential but marginal candidate for the coma stimulation program. His impression was that the patient was in a vegetative state and might be able to progress to the minimally responsive state over a period of time.

Comment:   My medical impression upon review of these records is that Sabina Paradi suffered a severe and diffuse traumatic brain injury on 2/25/07 that rendered her unconscious from the moment of impact until her death on June 30, 2007. At some point subsequent to the head injury, she evolved from coma (a sleep-like state from which the patient cannot be awakened) to the vegetative state (a state of wakefulness without consciousness). Imaging studies performed periodically during her course showed evidence of severe structural damage to the brain: EEGs, both at Saint Vincent's and at New York-Presbyterian Hospital showed low voltage and diffuse slowing indicative of severe brain damage without consciousness.

Mr. James Butler                    -8-                    January 28, 2008
Re: Sabina Paradi

Her autopsy, performed at the Medical Examiner's Office on 7/10/07, confirmed the presence of "chronic, diffuse, anoxic ischemic encephalopathy with neuronal loss and gliosis as well as focal cortical necrosis of the left frontal lobe with cortical and white matter contusions of both frontal and temporal lobes as well as necrosis and scarring of the basal ganglia (right thalamus) and the brainstem (medullary periventricular gray matter nuclei)."

I, therefore, must conclude that the allegations that the patient on some days in April followed commands or moved her left side purposefully or was agitated represent misinterpretations of reflex postures. It is not possible for a patient who suffered the injuries that Ms. Paradi suffered to have any conscious experience. It was in recognition of this fact that her physicians at New York-Presbyterian Hospital recommended that she be made DNR and be withdrawn from aggressive care.

I find with a reasonable degree of medical certainty that Sabina Paradi sustained no conscious pain and suffering from the time of the trauma on 2/25/07 until her death on 6/30/07.

Sincerely yours,

John J. Caronna, M.D.

JJC:CH

DOCUMENT ELECTRONICALLY FILED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
BODO PARADY, as Special Administrator of
the Estate of SABINA PARADI and BODO
PARADY and MARY MOORE, individually,

                                 07 CIV 3640 (JCF)
                                 ECF CASE

                Plaintiffs,               Magistrate Judge Francis

    -against-

                                 **CERTIFICATION**
MICHAEL R. PHILLIPS,

                Defendants,
-------------------------------------------------------x

       PAUL A. LIGGIO, of full age, hereby certifies as follows:

       1.     I am an attorney at law of the State of New York and the United States

District Court for the Southern District of New York, associated with the law firm of James

D. Butler, P.A., attorneys for defendant, Michael R. Phillips in the above matter, and as such,

I am familiar with the facts herein.

2.     The Exhibits ("A" through "C" herein) attached to this Notice of Motion in Limine to Bar Testimony of Steven Flanagan, M.D. and Angelo Canedo, Ph.D., Plaintiffs' Medical Experts, on issue of pain and suffering and level and awareness, are true copies from my file.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED:  July 18, 2008

                                               s/ Paul A. Liggio
                                               Paul A. Liggio (PAL/8122)
                                               JAMES D. BUTLER, P.A.
                                               Attorneys for Defendant, Phillips
                                               591 Summit Avenue
                                               Jersey City, New Jersey  07306
                                               (201) 653-1676